Filing # 58563716 E-Filed 07/03/2017 03:35:14 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.: 16-2017-CA-1937-XXXX-MA
DIVISION:  CV-C

**SHARON DeGUZMAN,**
  **an individual,**

     Plaintiff,

v.

**LOREN Z. CLAYMAN, M.D.,**
**LOREN Z. CLAYMAN, M.D., P.A.,**
**a Florida corporation,**
**ALLERGAN, INC.,**
**a foreign corporation,**
**ALLERGAN SALES, LLC,**
**a foreign limited liability company,** and
**ALLERGAN USA, INC.,**
**a foreign corporation,**

     Defendants.

_____/

## COMPLAINT

The Plaintiff, **SHARON DeGUZMAN, an individual,** sues the Defendants, **LOREN Z.**

**CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A., a Florida corporation,**

**ALLERGAN, INC., a foreign corporation, ALLERGAN SALES, LLC, a foreign limited**

**liability company,** and **ALLERGAN USA, INC., a foreign corporation,** and alleges the

following:

### GENERAL ALLEGATIONS

1.    This is an action for damages in excess of $15,000, exclusive of attorney's fees,

costs, and interest.

2.     All conditions precedent to the filing of this action have been performed or have occurred.

3.     At all times material hereto, the Plaintiff **SHARON DeGUZMAN** (hereinafter "Ms. DeGuzman") was and is a resident of, and permanently domiciled in, the State of Florida.

4.     At all times material hereto, the Defendant **LOREN Z. CLAYMAN, M.D.** (hereinafter "Loren Z. Clayman") was and is a resident of Jacksonville, Duval County, Florida.

5.     At all times material hereto, Loren Z. Clayman was and is a physician licensed to practice medicine by the State of Florida, who was and is practicing medicine in Duval County, Florida at his principal place of business located at 1801 Barrs Street, Suite 200, Jacksonville, Florida 32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

6.     All medical care and treatment rendered to **SHARON DeGUZMAN** upon which the claims set forth herein are based took place in Jacksonville, Duval County, Florida.

7.     At all times material hereto, Loren Z. Clayman held himself out as a specialist in the area of plastic surgery.

8.     At all times material hereto, the Defendant **LOREN Z. CLAYMAN, M.D., P.A.** (hereinafter "Clayman PA") was and is a Florida corporation, with its principal place of business at 1801 Barrs Street, Suite 200, Jacksonville, Florida 32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

9.     At all times material hereto, Loren Z. Clayman was and is an employee, agent or apparent agent of Clayman PA; at all times material hereto, Loren Z. Clayman was acting in the course and scope of his employment, agency or apparent agency with Clayman PA.

10.    The Defendant **ALLERGAN, INC.** is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

11.    The Defendant **ALLERGAN, INC.** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

12.    The Defendant **ALLERGAN, INC.** may be reached for service of process in the State of Florida through its registered agent, CT Corporation System at 1201 Hays Street, Suite 105, Tallahassee, Florida 32301.

13.    The Defendant **ALLERGAN SALES, LLC** is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

14.    The Defendant **ALLERGAN SALES, LLC** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

15.    The Defendant **ALLERGAN SALES, LLC** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island

Road, Plantation, Florida 33324.

16.    The Defendant **ALLERGAN USA, INC.** is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

17.    The Defendant **ALLERGAN USA, INC.** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit: researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

18.    The Defendant **ALLERGAN USA, INC.** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

19.    The Defendants **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.** are hereinafter collectively referred to as "Allergan."

## PROCEDURAL ALLEGATIONS

20.    Pursuant to an agreement executed by the attorney for Loren Z. Clayman and Clayman P.A. on February 22, 2017, and by the attorney for Ms. DeGuzman on April 7, 2017, Ms. DeGuzman has complied with all conditions precedent and pre-suit requirements for the filing of the instant lawsuit.

## FACTUAL ALLEGATIONS

### Allergan's Natrelle Saline Filled Breast Implants

21.    In 1962, two Texas plastic surgeons performed the first breast augmentation

surgery using silicone gel filled implants. In 1963, Dow Corning began manufacturing silicone gel filled breast implants based upon the Texas doctors' designs.

22.    Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants. In 1974 he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

23.    In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed. The new company's breast implants were still labeled McGhan breast implants. By this time the company was one of the largest breast implant manufacturers in the world.

24.    As a result of emerging safety concerns, in 1988 the United States Food and Drug Administration (FDA) re-classified silicone gel filled breast implants as Class III medical devices, which then required breast implant manufacturers to submit Pre-Market Approval (PMA) applications to the FDA to prove by valid scientific data that their respective implants were safe and effective.

25.    After reviewing the PMA applications of the different silicone breast implant manufacturers (including those of Inamed/McGhan), in 1992 the FDA prohibited the sale of silicone breast implants.

26.    In 1994, a $4 billion class action lawsuit over silicone filled breast implants was settled. Inamed contributed approximately $32,000,000 toward the settlement.

27.    In 1998, Inamed removed and replaced Donald K. McGhan from his position as chairman and chief executive of the company.[1]

28.    On November 16, 1999, Inamed filed a PMA for the "McGhan Medical RTV

---

[1]    McGhan is currently serving the remainder of a 10-year prison sentence in Texas for wire fraud in relation to a scheme in which he attempted to use real estate investors' money for another breast implant business.

Saline-Filled Breast Implant," later known as the "Natrelle Saline-Filled Breast Implant." On May 10, 2000, the FDA issued a letter approving the PMA.

29.    In March of 2006, Inamed merged with Allergan, Inc., a company that makes products for eye care, neuroscience and dermatology, including its best known product, Botox, the injectable wrinkle treatment.   Afterward, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

30.    On November 17, 2006, the FDA approved PMA's from both Allergan and Mentor (Allergan's main U.S. competitor in the design and manufacture of breast implants) for new silicone filled breast implants.

31.    On February 20, 2013, the FDA approved Allergan, Inc.'s PMA for the Natrelle 410, anatomically shaped highly cohesive silicone gel-filled breast implants, a type of breast implants that are commonly referred to as "gummy bear" implants.   The new implants were softer, more cohesive, and more anatomically shaped than saline filled implants.

32.    In the last several years, silicone gel-filled implants have become the most commonly used types of breast implants in the U.S.

33.    With all Natrelle breast implants, Inamed/Allergan included its "ConfidencePlus Warranty."   According to the ConfidencePlus warranty literature provided by Allergan, the warranty program applied to all FDA-approved Natrelle breast implants, provided the implants were used:

- As intended by appropriately qualified and licensed surgeons, in accordance with current and accepted plastic surgery techniques
- In accordance with the current *Natrelle* Breast Implant Directions for Use, found at www.allergan.com/labeling/usa.htm.

However, the warranty only applied to cases of:

- Loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention
- Capsular contracture (Baker Grade III/IV) with *Natrelle* Gel implants that requires surgical intervention

34.    Under Allergan's *ConfidencePlus Warranty Matrix,* the Standard warranty comes with Natrelle implants free of additional cost, while the Premier warranty cost an additional $100 until 2014, and $200 thereafter; both warranties have terms of coverage of 10 years. The Standard warranty provides for a lifetime replacement of the ruptured implant, replacement of the contralateral implant (for 10 years)[2], and $1,200 for the cost of replacement/revision surgery. The Premier warranty provides for lifetime replacement of both the ruptured and contralateral implants, plus $2,400 for the cost of replacement/revision surgery.

### Clayman Defendants

35.    Loren Z. Clayman was first licensed as a medical doctor in the State of Florida on January 10, 1975. On December 31, 1976, he completed a residency in plastic surgery, and he began practicing plastic surgery soon afterward in Jacksonville, Florida. On October 2, 1978, he filed articles of incorporation for Clayman PA, with himself listed as both President and the Registered Agent of the new corporation.

36.    Loren Z. Clayman began performing breast augmentation surgeries as part of his plastic surgery practice. During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

---

[2]    At first, only Natrelle Style 163 saline filled implants had lifetime replacement for contralateral breast implants; other Natrelle saline filled implants had only a 10 year warranty for contralateral implants. Beginning June 1, 2009, the Standard warranty was changed to provide for the lifetime replacement of contralateral breast implants for all Natrelle saline filled implants.

37.    After the FDA prohibited the sale of most silicone implants in 1992, Loren Z. Clayman began using saline filled implants almost exclusively.[3]

38.    By 2000, Loren Z. Clayman purchased at least a portion of the saline filled breast implants he used in augmentation procedures from Inamed/McGhan (later Allergan).    The majority (if not all) of saline filled breast implants he purchased from Inamed/McGhan were Natrelle saline filled breast implants.

39.    Before Ms. DeGuzman first consulted with Loren Z. Clayman regarding breast augmentation in 2010, he began making a higher than average number of warranty claims for patients with saline filled implants.    In the vast majority of these claims, Loren Z. Clayman and/or Clayman PA alleged that one or more saline implants spontaneously ruptured/deflated through no fault of the patient or himself.    Furthermore, Loren Z. Clayman and/or Clayman PA began making multiple, successive warranty claims for many of his/their patients.    This practice of Loren Z. Clayman and/or Clayman PA continued during the course of treatment of Ms. DeGuzman.

40.    Even after the FDA once again permitted the sale of silicone filled breast implants in 2006, Loren Z. Clayman and/or Clayman PA continued using saline filled breast implants almost exclusively for breast augmentation procedures.

41.    After June 30, 2008, Loren Z. Clayman's son, Mark Clayman, joined Clayman PA and began practicing plastic surgery, including performing breast augmentation procedures. For patients who received saline filled breast implants, Mark Clayman through Clayman PA also began making a higher than average number of warranty claims in which he alleged spontaneous ruptures/deflations through no fault of the patient or him.    Likewise, in many instances, Mark

---

[3]    Silicone filled breast implants could only be used for patients participating in ongoing medical studies, although it is unknown whether any of Loren Z. Clayman's patients participated in the studies.

Clayman through Clayman PA made multiple, successive warranty claims for patients, and he rarely, if ever, used silicone filled implants for breast augmentation procedures.

42.    **Between 2001 and 2015, Clayman PA made warranty claims to Allergan for more than 5,516 pairs of Natrelle saline filled breast implants.**

43.    According to Allergan's follow up studies for Natrelle saline filled implants, the rate of spontaneous deflations is approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year.

44.    Pursuant to 21 C.F.R. §§ 814.80 and 814.82, Allergan has a continuing obligation to evaluate the "safety, effectiveness, and reliability" of medical devices such as Allergan Natrelle saline filled breast implants.  In accordance with these requirements, Allergan performs a "*Laboratory Analysis*" of each returned breast implant to determine the cause of an alleged rupture/deflation, after which a report is generated and maintained.  For the overwhelming majority of saline filled breast implants returned by Clayman PA to Allergan, Allergan found no identifiable causes for the claimed spontaneous ruptures/deflations.

45.    Nevertheless, to the best of the undersigned's knowledge and belief, Allergan paid every one of Clayman PA's warranty claims between 2001 and 2015.

### SHARON DeGUZMAN

46.    Loren Z. Clayman failed to record or maintain a medical chart for his patient Sharon DeGuzman.  As a result, any lack of specificity regarding the allegations herein are limited by such failure.

47.    Sharon DeGuzman initially sought a consultation for a breast lift from Loren Z. Clayman's office in August, 2010.  Her breasts were sagging after breastfeeding her children and due to age.  She was also concerned about asymmetry in the size and shape of her breasts.  Loren

Z. Clayman assured her that saline breast implants would augment the breasts, even them out, and give her the look she wanted. Loren Z. Clayman explained that the breast implants would be placed in a submuscular position. She was very clear with Loren Z. Clayman that she didn't want a large augmentation and, in fact, did not wish to go larger than a size 36 D from her then current 36 C size. Loren Z. Clayman failed to address any of her concerns or discuss various options for treatment. The asymmetry was never addressed.

48.    A surgery cost estimate form would have been prepared which indicated a proposal to perform Augmentation Mammoplasty areola for $3,000, plus an operating room charge of $750.00.

49.    There no other details of the initial visit available. However, Loren Z. Clayman typically makes no record of a discussion with her regarding her objectives, the possible alternatives, and counseling with regard to her condition. The medical records would have also failed to document any detailed description of her current complaints, her desired goal, her family history, her past medical history, her past surgical history, or the medications she was taking. Loren Z. Clayman failed to conduct an adequate physical examination including dimensional assessment of Ms. DeGuzman's breasts, discussion of possible approaches, type or size of implants to be used, or how he intended to address her concerns.

50.    Ms. DeGuzman returned to Loren Z. Clayman's office for surgery on October 15, 2010. There was no physical examination prior to the surgery, specifically no documented dimensional assessment of Ms. DeGuzman's breasts nor any physical findings whatsoever. In fact, Loren Z. Clayman never saw the patient at all prior to surgery. Loren Z. Clayman never took into consideration the particular goals and objectives of this patient or discussed them with the patient.

51.     If one was taken at all, Loren Z. Clayman's staff would have taken a single preoperative Polaroid photograph of Sharon DeGuzman on the date of surgery. Based on subsequent photographs, however, it is apparent that preoperatively Ms. Guzman's breasts demonstrated severe Grade IV ptosis (sagging), particularly on the right, with both nipples pointing to the ground, asymmetry of the breast structure, asymmetry of the areolas, and significant difference in size. These conditions were not appreciated by Loren Z. Clayman or discussed with the patient.

52.     Loren Z. Clayman failed to obtain appropriate informed consent for the surgery of October 15, 2010. Loren Z. Clayman failed to provide appropriate counseling regarding the size of the implants, the type of implants, the obvious asymmetry or the proper alternatives or options, including mastopexy, to address this patient's concerns and meet her objectives.

53.     Sharon DeGuzman underwent breast augmentation surgery by Dr. Loren Z. Clayman on October 15, 2010. Loren Z. Clayman made incisions through the inframammary fold and augmented Ms. DeGuzman's breasts with Allergan Natrelle Style 68 High Profile 400 cc saline implants. Loren Z. Clayman did not measure or record the amount of saline used to inflate the implants and, based on his estimates, used the same amount of saline for each implant. By so doing, he failed to take into consideration the patient's pre-existing asymmetry and only exacerbated the asymmetrical appearance of the breasts. Moreover, Loren Z. Clayman over-inflated the implants with saline, filling each beyond the manufacturer's recommendation. Loren Z. Clayman claimed to have placed the implants under the muscle although this was not done. Loren Z. Clayman failed to assess the patient's breasts for symmetry intraoperatively.

54.     Ms. DeGuzman had warned Loren Z. Clayman's staff that she had a history of nausea with anesthesia. The patient was put under intravenous sedation with Versed and

Ketamine administered by a registered nurse. During the sedation she could feel herself drifting in and out and felt like she was in a tunnel. She could hear music playing and talking and could see Loren Z. Clayman. She was half asleep and half awake.

55.    When Ms. DeGuzman returned to Loren Z. Clayman's office for post-operative follow up she complained that her breasts were too large, far larger than she wanted. There was no physical examination by a physician and the patient's concerns were not addressed or even recognized. Loren Z. Clayman merely reassured her that they "would settle" and the swelling would go down.

56.    Ms. DeGuzman returned again to Loren Z. Clayman's office to have her sutures removed. She was even more distressed about the large size of her breasts and noted that, in addition to looking too big, they felt too big as well. There was no physical examination by a physician and the patient's concerns were not addressed or even recognized. Loren Z. Clayman merely reassured her that they "would settle" and the swelling would go down.

57.    A year after the surgery Ms. DeGuzman again returned to Loren Z. Clayman's office complaining of asymmetry and the large size of her breasts. She also complained that her scars were itching and burning. There was no physical examination by a physician, or no adequate physical examination by a physician. She was told that her left breast implant had deflated. Since it was under warranty, she would only be charged the operating room fee to replace the implant and correct her problem. Loren Z. Clayman reassured her that he would repair her scars, put in new implants (plural, not just the allegedly ruptured implant), improve her cleavage, and put the implants under the muscle. The only record of that visit is a surgery cost estimate form noting "L deflatation [sic]" will be performed at no charge since the "co. will supply" and an operating room charge of $750.

12

58.    Ms. DeGuzman returned for her first breast surgery revision on April 11, 2012 or May 11, 2012. There was no physical examination prior to the surgery, specifically no dimensional assessment of Ms. DeGuzman's breasts and no physical findings whatsoever. The patient's assessment was that her right breast was a different size than her left one, and both were too large. These concerns were never acknowledged or addressed.

59.    Loren Z. Clayman did not obtain appropriate informed consent prior to surgery. Specifically, Loren Z. Clayman failed to adequately counsel the patient regarding her condition and discuss appropriate alternatives and options to correct her problems and meet her objectives. Loren Z. Clayman did not adequately, if at all, discuss the goals of surgery or exactly what surgery would be performed.    Instead, Loren Z. Clayman simply claimed that there was a deflation and she required replacement of both implants.

60.    The Authorization for and Consent to Surgery, if one was prepared at all, would have indicated the presence of a left deflation as the need for a bilateral replacement. However, Ms. DeGuzman did not have a deflation of either implant and there was no evidence of deflation. Loren Z. Clayman simply used the alleged deflation as an excuse to try to correct his prior surgical insufficiency. In fact, Loren Z. Clayman did not see the patient at all prior to surgery.

61.    The Operative Report, if one was prepared at all, of April 11, 2012 or May 11, 2012 would have listed a left deflation, despite the absence of any evidence of a left implant deflation. Loren Z. Clayman replaced both implants with the same size and type, Allergan Natrelle Style 68 High Profile 400 cc saline implants, which would have done nothing to address her concerns that her breasts were too large. Loren Z. Clayman did not measure the amount of saline infused into the implants but merely estimated. Loren Z. Clayman failed to assess the results intraoperatively for symmetry.

62.     Despite, Ms. DeGuzman's prior warning to Loren Z. Clayman's staff that she had a history of nausea with anesthesia, the same protocol was used. The patient was put under intravenous sedation with Versed and Ketamine administered by a registered nurse. She was in significant pain throughout the surgery, clinching her hands and crying.

63.     When Ms. DeGuzman returned to Loren Z. Clayman's office for post-operative follow up she again complained that her breasts were huge. There was no physical examination by a physician and the patient's concerns were not addressed or even recognized. Loren Z. Clayman merely reassured her that they "would settle" and the swelling would go down.

64.     Ms. DeGuzman returned for a second follow up visit to Loren Z. Clayman complaining that her breasts were now even larger than before, even though they were far too large the first time. Since Loren Z. Clayman had used the same size and type implants for the second surgery it is apparent that he overfilled them the second time even more than the first. In addition Ms. DeGuzman complained that her skin was stretched, she had lost sensation in her nipple, her breasts were painful and they were asymmetrical. In addition her breasts were far too heavy and causing back pain. There was no physical examination by a physician and the patient's concerns were not addressed or even recognized. Loren Z. Clayman merely reassured her that they "would settle" and the swelling would go down.

65.     Ms. DeGuzman had a mammogram of her breasts performed in September 2016. The mammogram revealed that her implants were not placed under the pectoralis muscle as promised and claimed by Loren Z. Clayman. She had not been told the truth.

66.     During one or more of her visits to Clayman PA, Loren Z. Clayman examined the patient without a chaperone, made improper anatomical references, called her breasts "titties" or "tits," and "handled" her breasts with his body positioned behind and against hers while

14

examining her as she faced a mirror.  Loren Z. Clayman did not wear gloves during the examinations.

67.     Ultimately, Sharon DeGuzman left the care of Clayman Plastic Surgery.  After two (2) at the hands of Dr. Loren Z. Clayman, Ms. DeGuzman's implants remained asymmetrical, painful, and demonstrated a poor aesthetic appearance. They were so large that they were causing back problems and were extremely hard, especially on the left. The areolas were very widely stretched overlying the implants. She had significant scarring and tissue damage

68.     On January 25, 2017 Ms. DeGuzman was seen in consultation by Dr. John Obi of Jacksonville Plastic Surgery, Inc.  The history lists her subjective concerns as breast asymmetry, soreness, pain, and hardness following two separate surgeries by Dr. Loren Z. Clayman.  She was noted to currently be wearing a size 36 DD bra.  Dr. Obi notes obvious over-inflation of breast implants with Baker IV contractures bilaterally.  There is significant asymmetry and ptosis as well.

69.     Dr Obi discussed the treatment options to correct the deformities and ultimately recommended a two-staged procedure with removal of the implants and capsulectomy followed, after healing, by a second procedure to augment and lift the breasts.  As opposed to Loren Z. Clayman, Dr. Obi discussed the relative advantages and disadvantages of silicone as opposed to saline implants.  Of note, he remarked on the likelihood of a permanent donut deformity as a consequence of the extreme over-inflation of the saline implants placed by Dr. Loren Z. Clayman.

70.    Pr-operative photographs taken by Dr. Obi on January 25, 2017 demonstrate the findings of asymmetry, hyperinflation, ptosis, and distortion of the breasts following the surgeries by Loren Z. Clayman.

71.    Dr. Obi proceeded with the breast surgery on February 10, 2017 and both saline implants were removed through the previous infra-mammary incisions. An anterior capsulotomy was performed and the grossly overinflated implants were removed without entering the subpectoral plane. Over-inflation is also confirmed photographically. Following removal of the implants the pre-operative asymmetry is demonstrated with a difference of as much as 150 cc between the two implants noted. Ultimately Ms. DeGuzman will require yet another operation, an augment mastopexy, to correct the ptosis and asymmetry, as should have been done at the initial procedure, and certainly in the second procedure, by Dr. Loren Z. Clayman.

## COUNT I – CLAYMAN DEFENDANTS' MEDICAL NEGLIGENCE

72.    Ms. DeGuzman re-alleges and incorporates by reference paragraphs 1 through 71.

73.    At all times material, Loren Z. Clayman owed Ms. DeGuzman a duty to exercise that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably careful physicians caring for a patient such as Ms. DeGuzman.

74.    On or between August 2010 and the end of her treatment by Loren Z. Clayman, Loren Z. Clayman and/or Clayman PA fell below the accepted and/or applicable standard of care in the treatment of Ms. DeGuzman in one or more of the following ways:

A.    Loren Z. Clayman failed to create and/or maintain a medical chart for Sharon DeGuzman.

B.      To the extent that Loren Z. Clayman created a medical chart, the office notes throughout Ms. DeGuzman's care would have been grossly inadequate. None of the consultations or follow-up care would contain any direct documentation by Loren Z. Clayman of their encounters.    There would have been no direct documentation of assessment at any time by Loren Z. Clayman other than the operative report. At a minimum, documentation should reflect the patient's subjective concerns, a review of pertinent medical history, physical assessments including direct measurements, and a synopsis of findings leading to the surgical recommendation.

C.      There was no discussion at the initial preoperative visit of Ms. DeGuzman's complaints, her desired goal(s), past medical history, past surgical history, or current medications.

D.      There was no discussion of implant size or detailed discussion of implant type and placement.  Patients should have the opportunity to try different size implants and have a documented discussion regarding incision placement, tissue plane (pre/subpectoral), implant type, and implant size.  In Ms. DeGuzman's case, there are no such discussions.  Continuing questions and concerns regarding the size of her breasts by Ms. DeGuzman confirms that these discussions did not take place.

E.      Loren Z. Clayman failed to take into account or simply ignored Ms. DeGuzman's requests. Ms. DeGuzman clearly indicated that she did not want her breasts to be too large. The chronic pain, hardness, and her subjective complaints are all a result of Loren Z. Clayman ignoring her requests and concerns.

F.      It is the generally accepted standard of care to take basic measurements of breast dimensions to appropriately guide and help select the optimal implant size for a

given patient's breast and chest size. Loren Z. Clayman did not take breast measurements that would have helped a prudent surgeon pick an appropriately sized implant for this patient based on commonly accepted dimensional planning concepts. There was no discussion regarding implant volume or evidence that there was an attempt to size the patient appropriately prior to proceeding with surgery.

G.    Loren Z. Clayman did not conduct detailed physical examinations, detailed assessments/plans, or detailed discussions of the informed consent process. Lack of appropriate follow-up visits is also a serious concern. No physician assessments or specific plans of care were conducted in such visits.

H.    Loren Z. Clayman failed to conduct physical examinations of the patient on the day of surgery.

I.    Even if photographs were taken, the photographic documentation typically taken by Loren Z. Clayman and his staff is inadequate. At the very minimum, antero-posterior, lateral and oblique views should be obtained. Standardization of photo background, lighting, height, and distance is also important and considered standard of care as it allows not only a means of further objective assessment of the problem, but also a means of comparison over time. The lack of adequate, standardized photographic documentation is very likely deliberate so that Loren Z. Clayman can continue to claim evidence of implant deflation when no such evidence exists.

J.    Loren Z. Clayman never adequately answered the patient's questions or provided appropriate information to obtain appropriate informed consent for the surgical procedures conducted. Specifically, Loren Z. Clayman did not obtain appropriate informed consent from the patient for the implant placement in the October 15, 2010

surgery or for the implant replacement in the April 11, 2012 or May 11, 2012 surgery. Loren Z. Clayman changed the size of implants without any indication that the patient approved or was even aware of the change.

K.    After undergoing two (2) surgeries at Clayman Plastic Surgery, Ms. DeGuzman continued to have problems and exhibited a sub-optimal result. The patient was justifiably unhappy with the appearance of her breasts despite the repeated surgery. Moreover, she required additional surgeries just to try to correct the problems created by Loren Z. Clayman. It is clear that nearly every aspect of her care was mismanaged and fell below the standard of care.

L.    Ms. DeGuzman continued through her treatment and surgeries to demonstrate breasts that were misshapen, painful, and much larger than she wanted. These concerns were brought to the attention of Dr. Loren Clayman and/or his staff, but were never satisfactorily addressed. Instead, Loren Z. Clayman simply claimed deflation and replaced the implants with a larger size hoping for a better result but failing to provide the appropriate procedure to obtain the best possible result for the patient. No appropriate attempt was ever made to address the repeated complaint of asymmetry.

M.    Ms. DeGuzman's current complaints and persistent deformities were set in motion by poor preoperative counseling and assessment, as well as poor to non-existent surgical planning and preparation, poor intraoperative execution of the first surgery and in the subsequent removal and replacement surgery. The patient suffered from the following conditions as a result: (1) asymmetry of the breast structures; (2) asymmetry of the areolas; (3) over-inflation of the implants with obvious distortion of the breasts; and (4) pain in both the breasts and back.

19

N.    It was incumbent upon Dr. Loren Clayman to counsel Ms. DeGuzman as to realistic and safe recommendations that would address her concerns and obtain her goals. As reflected in the continuing deformity and painful condition of the breasts, Ms. DeGuzman required an appropriate mastopexy and properly sized implants from the beginning. Loren Z. Clayman failed to provide or even offer such a procedure to Ms. DeGuzman, with the result being her continuing breast deformities and the need for subsequent surgeries.

O.    By operating on this patient and claiming that her implant had deflated, Loren Z. Clayman placed her at an increased risk for surgical and anesthetic complications. These complications include infection, scarring, capsular contracture, and pain. Moreover, these surgeries resulted in continuing deformities, pain, restrictions on activities, and cost. These surgeries could have been avoided had Loren Z. Clayman used appropriately sized implants and placed them in an appropriate position.

P.    Instead of placing an implant of an appropriate size and projection in combination with a standard mastopexy, the patient's condition was only exacerbated by the subsequent surgery that failed to address the primary problem. By failing to include these options and perform these procedures in Ms. DeGuzman's treatment plan, she was "started down a road" of repetitive, ineffectual operations that could have been avoided had they been performed in combination with appropriately sized implants chosen using commonly accepted dimensional planning concepts.

Q.    In addition to the failure to perform the procedures noted above, Loren Z. Clayman exacerbated the patient's asymmetry, ptosis (sagging), and areolar size by placement of the overfilled, high profile implants. Prolonged malposition in the lower

pole location and worsening ptosis with widened areola diameter resulted in excessive and irreversible expansion of the lower poles that could only be corrected through extensive internal capsule work or formal mastopexy procedure.

      R.     Silicone gel implants should have been offered or at least considered after the first and subsequent surgeries. The benefits of switching to the silicone implants include a negligible risk of implant rupture and deflation, as well as a softer, less painful, and more natural feel without rippling compared to overfilled saline implants.

      S.     Many of Ms. DeGuzman's problems can be traced to grossly overfilling the saline implants placed by Loren Z. Clayman. Overfilling saline implants frequently leads to excessive firmness or hardness of the entire breast and discomfort. It can, and did in Ms. DeGuzman's case, additionally lead to capsular contracture. Ms. DeGuzman complained that her implants were very hard and uncomfortable. This appears to be directly related to filling the implants beyond their recommended capacity. Moreover, the sheer volume of augmentation used magnified the preexisting asymmetries of the breasts resulting in a worse appearance aesthetically.

      T.     It is evident that Loren Z. Clayman failed to measure and/or record the amount of saline used to inflate the implant(s) on each occasion. Instead, Loren Z. Clayman merely estimated the amount of saline used. Measuring the amount of saline that is used allows the physician to make appropriate adjustments if subsequent breast revision surgeries are made based on a quantitative analysis rather than merely guessing the amount of saline necessary to achieve symmetry and equal size. Here, that failure contributed to size disparity and grossly overfilling the saline implants. Overfilling a 400 cc saline implant far beyond the manufacturer's recommendation causes excessive

firmness and discomfort. Moreover, it frequently leads to sagging, malposition, and the creation of over-sized areolas.

U.    To the extent that the surgery of April 11, 2012 or May 11, 2012 was indicated at all, it was indicated for the removal and replacement of only the implant suspected of deflation, not both implants.

V.    The type and quality of anesthesia provided to Ms. DeGuzman to perform the initial purported subpectoral breast augmentation and subsequent revision was inadequate and improper.    Loren Z. Clayman, M.D. used the sedation protocol of ketamine and versed, which was administered by a registered nurse.    This led to significant under-sedation, which was evident in this case.    Intravenous sedation should be deep enough to adequately perform the procedure without the patient being able to hear conversations, recall the procedure, or remember waking up during the surgery.    Ms. DeGuzman woke up during both of Loren Z. Clayman's surgeries many times and remembered feeling pain and crying.    Moreover, the anesthetic regimen continued to be administered despite its insufficiency and the adverse complications experienced by the patient.

W.    It is very likely that the implants were difficult to position under the pectoralis major muscle due to inadequate muscle paralysis.    Subpectoral implants may be placed under intravenous sedation provided that a proper pectoralis block is performed to adequately relax the muscle in combination with rib blocks for optimal pain control.    There is no evidence that this was performed during any of Ms. DeGuzman's surgeries, contributing further to her breast ptosis (sagging) and asymmetry. The inadequate intravenous sedation during Ms. DeGuzman's procedures

more likely than not lead to an inadequate subpectoral plane and pocket development, and likely caused or contributed to the implants being placed above the muscle.

X.    General anesthesia should have been considered for the revisionary procedures because they were significantly more involved than her initial breast augmentation procedure and because of the history of inadequate sedation and adverse reactions suffered by the patient. More likely than not, Loren Z. Clayman, M.D. took into account the limitations of intravenous sedation when he performed the revision surgeries, and there was no legitimate medical justification for choosing intravenous sedation administered by a registered nurse for these procedures. It appears that Loren Z. Clayman, M.D. chose this approach merely to control costs and in this particular case, as another excuse to avoid performing a formal mastopexy.

Y.    The removal and replacement of Ms. DeGuzman's implants on April 11, 2012 or May 11, 2012 due to an alleged deflation was, at a minimum, an extreme deviation from the standard of care. Allergan's implant follow-up studies show spontaneous saline implant deflation rates of only approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year. There was no photographic evidence of implant deflation, no patient complaints indicative of implant deflation, and no evidence of implant failure upon examination of the explanted saline devices by Allergan. Simply, Ms. DeGuzman did not have a deflation..

Z.    Loren Z. Clayman concealed or intentionally misrepresented the cause of the patient's post-surgical results and subsequent complaints by claiming spontaneous deflation.

AA.    Loren Z. Clayman failed to act in a professional manner.   Loren Z. Clayman examined the patient without a chaperone, made improper anatomical references, called her breasts "titties" or "tits," and "handled" her breasts with his body positioned behind and against hers while examining her as she faced a mirror.   These actions are entirely unprofessional and a breach of the standard of care.

75.    As a direct and proximate result of above noted breach or breaches of the standard of care by Loren Z. Clayman and/or Clayman PA, Ms. DeGuzman suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

76.    Furthermore, on one or more occasions Loren Z. Clayman and/or Clayman PA fraudulently concealed or intentionally misrepresented to Ms. DeGuzman and/or others that a saline implant that had been implanted in her body spontaneously deflated or ruptured; such fraud, concealment, or intentional misrepresentation caused Ms. DeGuzman to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of the applicable standard of care by Loren Z. Clayman and/or Clayman PA.

WHEREFORE, the Plaintiff **SHARON DeGUZMAN** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.** and **LOREN Z. CLAYMAN, M.D., P.A.** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT II – CLAYMAN DEFENDANTS' BREACH OF FIDUCIARY DUTY

77.     Ms. DeGuzman re-alleges and incorporates by reference paragraphs 1 through 71 and 74.

78.     On or between August 2010 and the conclusion of her treatment, Ms. DeGuzman was a patient of Loren Z. Clayman.  By virtue of the physician-patient relationship, Loren Z. Clayman and Clayman PA had a fiduciary duty to Ms. DeGuzman to not perform acts for his/their own pecuniary gain that were contrary to her welfare.

79.     Loren Z. Clayman and/or Clayman PA violated this fiduciary duty to Ms. DeGuzman in one or more of the following ways:

(a).     By claiming that her breast implant had deflated when in fact it had not.

(b).     By operating on Ms. DeGuzman based on an alleged deflated implant, which placed her at an increased risk for surgical and anesthetic complications, yet simply repeating the same procedure that was previously performed.

(c).     By not performing the surgery that her physical condition actually required, as described above, in favor of surgery that took less time and skill, to save Loren Z. Clayman and/or Clayman PA time and money.

(d).     By operating on her when he knew or should have known that he did not have the skill or competency to perform the surgeries within the standard of care.

(e).     By operating on her so that Loren Z. Clayman and/or Clayman PA could recover a surgical fee from Allergan.

(f).     By performing surgery with inadequate anesthesia because it was cheaper, which in turn led to improper implant placement as well as increased pain, discomfort, and anxiety.

80.    Furthermore, on one or more occasions Loren Z. Clayman and/or Clayman PA fraudulently concealed or intentionally misrepresented to Ms. DeGuzman and/or others that a saline implant that had been implanted in her body had spontaneously deflated; such fraud, concealment, or intentional misrepresentation caused Ms. DeGuzman to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of Loren Z. Clayman's fiduciary duties to her.

81.    As a direct and proximate result of Loren Z. Clayman's and/or Clayman PA's breaches of fiduciary duties to Ms. DeGuzman, she suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff **SHARON DeGUZMAN** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.,** and **LOREN Z. CLAYMAN, M.D., P.A.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

### COUNT III – CLAYMAN DEFENDANTS' VIOLATIONS OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

82.    Ms. DeGuzman re-alleges and incorporates by reference paragraphs 1 through 71.

83.    On one or more occasions between August 2010 and the end of her treatment, Loren Z. Clayman and/or Clayman PA, engaged in one or more of the following acts:

(a).    Caused or allowed to be printed, published, or otherwise disseminated to the general public advertisements soliciting patients for "Dr. Clayman's Plastic Surgery

Center & Miracle Spa" when there is no organized entity or even a registered fictitious name for such an entity or organization.

(b).    Caused or allowed to be printed, published, or otherwise disseminated to the general public advertisements that represented that Loren Z. Clayman had the experience, competence and finesse to produce extraordinary surgical results, when in fact such representations were false.

(c).    Represented to Ms. DeGuzman and/or others that a saline implant that had been implanted in her had spontaneously ruptured or deflated, when in fact it had not.

84.    The aforementioned acts of Loren Z. Clayman and/or Clayman PA were "[u]nfair methods of competition, unconscionable acts or practices, or unfair or deceptive practices" as contemplated by Section 501.204, *Florida Statutes*.

85.    Ms. DeGuzman is a "consumer" and Loren Z. Clayman and/or Clayman PA were and are engaged in "trade or commerce," as both terms are defined in Section 501.203 (7) and (8), Florida Statutes.

86.    As a direct and proximate result of the aforesaid acts of Loren Z. Clayman and/or Clayman PA, Ms. DeGuzman suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

87.    Furthermore, as a direct and proximate result of the aforesaid acts of Loren Z. Clayman and/or Clayman PA, Ms. DeGuzman spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value,

and which caused her to need future medical care and incur related expenses to correct the damages done by said past medical and/or surgical care of Loren Z. Clayman and/or Clayman PA.

88.    As a result of the aforesaid acts of Loren Z. Clayman and/or Clayman PA, Ms. DeGuzman has retained or employed the undersigned law firm, and she has agreed to pay the firm a reasonable fee for its services in that regard.

WHEREFORE, the Plaintiff **SHARON DeGUZMAN** seeks the following relief:

(a).    Judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.,** and/or **LOREN Z. CLAYMAN, M.D., P.A.**

(b).    The court costs of this action, and attorney's fees pursuant to Sections 501.2105 and 501.211(2), *Florida Statutes.*

(c).    A declaratory judgment that one or more acts or practices of one or more of the Defendants violated the *Florida Deceptive and Unfair Trade Practices Act.*

(d).    An order enjoining one or more of the Defendants from engaging in the above noted acts or practices.

(e).    The Plaintiff further demands a trial by jury on all issues so triable.

### COUNT IV – CLAYMAN DEFENDANTS' FRAUD

89.    Ms. DeGuzman re-alleges and incorporates by reference paragraphs 1 through 71.

90.    On one or more of the below occasions, Loren Z. Clayman and/or Clayman PA made the following false statements or representations, which were intended to conceal his inability to perform the breast augmentation procedures competently and within the standard of care, and which in fact misled Ms. DeGuzman and/or caused her to respond in the following ways to her detriment:

(a).    Prior to April 11, 2012 or May 11, 2012, Loren Z. Clayman told Ms. DeGuzman that her left breast implant was deflated and needed to be replaced. In fact, Ms. DeGuzman did not have a left implant deflation, rupture, or leak, and he did not have the intention or ability to correct the actual problems with her breasts. These representations caused Ms. DeGuzman to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. DeGuzman did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(b).    In a surgical estimate prepared on prior to April 11, 2012 or May 11, 2012, Loren Z. Clayman represented to Ms. DeGuzman that her left breast implant was deflated and needed to be replaced. In fact, Ms. DeGuzman did not have a left implant deflation, rupture, or leak, and he did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. DeGuzman to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. DeGuzman did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(c).    In the informed consent dated April 11, 2012 or May 11, 2012, Loren Z. Clayman represented to Ms. DeGuzman that her left breast implant was deflated and needed to be replaced. In fact, Ms. DeGuzman did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. DeGuzman to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. DeGuzman did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(d).    In the Operative Report and OR Record dated April 11, 2012 or May 11, 2012, Loren Z. Clayman represented to Ms. DeGuzman that her left breast implant was deflated and needed to be replaced. In fact, Ms. DeGuzman did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. DeGuzman to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. DeGuzman did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(e).    After the April 11, 2012 or May 11, 2012 surgery, Loren Z. Clayman made a warranty claim to Allergan regarding the left implant removed in the April 11, 2012 or May 11, 2012 surgery indicating a defect of the implant.  By having Ms. DeGuzman sign this claim form Loren Z. Clayman represented to her that her left implant was leaking and/or defective and needed to be replaced.  In fact, Ms. DeGuzman did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. DeGuzman to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had defective breast implants; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. DeGuzman did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(f).    In August 2010 and at each visit with his office thereafter, Loren Z. Clayman represented to Ms. DeGuzman that he was a competent plastic surgeon who could perform breast augmentation revision and related procedures in a reasonably competent manner that was within the standard of care.  This representation was false because he was not in fact reasonably competent to perform the requested procedures within the standard of care.  This representation caused Ms. DeGuzman to choose Loren Z. Clayman for breast surgery as opposed to other plastic surgeons.

(g).    In August 2010 and at each visit thereafter, Loren Z. Clayman represented that he knew the appearance that Ms. DeGuzman wanted for her breasts, and that he

31

could achieve that appearance through the planned surgery. In fact, whether Loren Z. Clayman knew what appearance she desired or not, he did not have the ability or intention to perform the procedures necessary to provide her with the desired appearance (i.e. addressing her complaints of sagging and asymmetry). This representation caused Ms. DeGuzman to choose Loren Z. Clayman for breast surgery as opposed to other plastic surgeons who would have been able to provide her with the desired appearance.

91.    As a result of the above false statements or representations, Loren Z. Clayman, and/or Clayman PA were able to continue collecting money in relation to the medical and surgical care of Ms. DeGuzman, Ms. DeGuzman did not seek a second opinion from another plastic surgeon, and/or Ms. DeGuzman delayed seeking legal counsel for potential medical negligence.

92.    As a direct and proximate result of the above noted false statements or representations of Loren Z. Clayman and/or employees or agents of Clayman PA, Ms. DeGuzman suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

93.    Furthermore, as a direct and proximate result of the above noted false statements or representations by Loren Z. Clayman and/or employees or agents of Clayman PA, Ms. DeGuzman spent monies in the amount of $3,750 or more for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which has caused her to have to

incur future medical expenses for medical and surgical care to correct the damage done by Loren Z. Clayman and/or Clayman PA.

WHEREFORE, the Plaintiff **SHARON DeGUZMAN** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.** and **LOREN Z. CLAYMAN, M.D., P.A.** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

### COUNT V – CLAYMAN DEFENDANTS AND ALLERGAN'S CONSPIRACY TO COMMIT FRAUD AND/OR BREACH OF FIDUCIARY DUTY

94. Ms. DeGuzman re-alleges and incorporates by reference paragraphs 1 through 71.

95. On or before August 2010, Loren Z. Clayman and/or Clayman PA entered into an agreement with Allergan to commit fraud and/or breach of fiduciary duty.

96. Ms. DeGuzman re-alleges and incorporates by reference paragraphs 78 through 81 as the allegations of conduct by Loren Z. Clayman and/or Clayman PA in furtherance of the breach of the fiduciary duty owed by Loren Z. Clayman and/or Clayman PA to Ms. DeGuzman.

97. Ms. DeGuzman re-alleges and incorporates by reference paragraphs 90 through 93 as the allegations of fraud upon Ms. DeGuzman committed by Loren Z. Clayman and/or Clayman PA.

98. Allergan committed one or more of the following overt acts in furtherance of the conspiracy to commit fraud and/or breach of fiduciary duty:

(a). Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. DeGuzman on October 15, 2010, and which Loren Z. Clayman surgically removed on April 11, 2012 or May 11, 2012, despite

the following:

> (1).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. DeGuzman on October 15, 2010, and explanted from Ms. DeGuzman by Loren Z. Clayman on April 11, 2012 or May 11, 2012, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the April 11, 2012 or May 11, 2012 surgery was not necessary as a result of a failed breast implant;

> (2).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

> (3).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(b).    Continuing to sell saline filled breast implants to Loren Z. Clayman and/or Clayman PA after August 2010, despite the following:

> (1).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. DeGuzman on October 15, 2010, and explanted from Ms. DeGuzman by Loren Z. Clayman on April 11, 2012 or May 11, 2012, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the April 11, 2012 or May 11, 2012 surgery was not necessary as a result of a failed breast implant;

> (2).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

> (3).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly

higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(c).    Failing to report Loren Z. Clayman, and/or Clayman PA to the appropriate authorities after August 2010, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. DeGuzman on October 15, 2010, and explanted from Ms. DeGuzman by Loren Z. Clayman on April 11, 2012 or May 11, 2012 did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the April 11, 2012 or May 11, 2012 surgery was not necessary as a result of a failed breast implant;

(2).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(3).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

99.    As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman and/or Clayman PA, and also by Allergan, Ms. DeGuzman suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

100.    Furthermore, as a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman and/or Clayman PA, and also

by Allergan, Ms. DeGuzman has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman, and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff **SHARON DeGUZMAN** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A., ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

### COUNT VI – ALLERGAN AIDING AND ABETTING FRAUD AND/OR BREACH OF FIDUCIARY DUTY

101.    Ms. DeGuzman re-alleges and incorporates by reference paragraphs 1 through 71.

102.    Ms. DeGuzman re-alleges and incorporates by reference paragraphs 78 through 81 as the allegations of conduct by Loren Z. Clayman, and/or Clayman PA in furtherance of the breach of the fiduciary duty owed by Loren Z. Clayman and/or Clayman PA to Ms. DeGuzman.

103.    Ms. DeGuzman re-alleges and incorporates by reference paragraphs 90 through 93 as the allegations of fraud upon Ms. DeGuzman committed by Loren Z. Clayman and/or Clayman PA.

104.    Allergan, through its employees or agents, knew that Loren Z. Clayman and/or Clayman PA, was committing fraud upon Ms. DeGuzman, and/or breaching a fiduciary duty owed to Ms. DeGuzman, due to the following:

(a).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. DeGuzman on October 15, 2010, and explanted from Ms. DeGuzman by Loren Z. Clayman on April 11, 2012 or May 11, 2012 did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation

36

that requires surgical intervention," and, thus, that the April 11, 2012 or May 11, 2012 surgery was not necessary as a result of a failed breast implant;

(b).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(c).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

105.    Despite the aforesaid knowledge of Allergan through its employees or agents, Allergan provided substantial assistance to Loren Z. Clayman and/or Clayman PA in committing fraud against Ms. DeGuzman, and/or breaching a fiduciary duty owed to Ms. DeGuzman, in either or both of the following ways:

(a).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. DeGuzman on October 15, 2010, and which Loren Z. Clayman surgically removed on April 11, 2012 or May 11, 2012.

(b).    Continuing to sell saline filled breast implants to Loren Z. Clayman, and/or Clayman PA after August 2010; and/or

(c).    Failing to report Loren Z. Clayman and/or Clayman PA to the appropriate authorities after August 2010.

106.    As a direct and proximate result of the substantial assistance provided by Allergan to Loren Z. Clayman and/or Clayman PA, Ms. DeGuzman suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the

enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

107.    Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan to Loren Z. Clayman and/or Clayman PA, Ms. DeGuzman has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff **SHARON DeGUZMAN** demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VII – ALLERGAN'S STRICT LIABILITY FOR DEFECTIVE PRODUCTS

108.    Ms. DeGuzman re-alleges and incorporates by reference paragraphs 1 through 71.

109.    Allergan designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants:  right and left Natrelle Style 68 High Profile 400 cc saline filled breast implants with serial numbers 16080731 and 15169987, respectively, that were implanted into Ms. DeGuzman on October 15, 2010, and explanted from Ms. DeGuzman on April 11, 2012 or May 11, 2012; right and left Natrelle Style 68 High Profile 400 cc saline filled breast implants with serial numbers 17272629 and 17272633, respectively,

that were implanted into Ms. DeGuzman on April 11, 2012 or May 11, 2012, and explanted from Ms. DeGuzman on February 10, 2017.

110.    At all times material, Allergan expected the aforesaid saline filled breast implants to reach, and either or both did in fact reach, consumers in the State of Florida, including Ms. DeGuzman, without substantial changes in the condition in which they were sold or distributed.

111.    At all times material, one or more of the aforesaid saline filled breast implants were being used in the manner intended, or based upon all of the circumstances reasonably expected, by Allergan.

112.    At all times material, one or more of the aforesaid saline filled breast implants were in fact defective and in an unreasonably dangerous condition at the time they were placed into the stream of commerce, and when put to their reasonably anticipated use, in one or more of the following ways:

    a.   <u>Design</u>

        (1).    One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

        (2).    One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and

        (3).    Prior to the time that the implants identified above were sold, distributed, and/or placed into the stream of commerce, a safer alternative

design for the aforesaid saline filled breast implants existed and was commercially feasible; and

(4).    The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.    <u>Manufacture</u>

One or more of the aforesaid saline filled breast implants was defectively manufactured such that

(1).    the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    the valves allowed saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

c.    <u>Warning</u>

(1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of their valves permitting liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained inadequate warning of the risks of their valves allowing saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

113.    The defective condition of one or both of the aforesaid saline filled breast implants subjected patients receiving the breast implants to infection or rupture/deflation, which

exceeded the benefits of the products, and for which safer products were available. This defective condition made one or both pairs of the aforesaid saline filled breast implants unreasonably dangerous when put to use as intended or reasonably expected by Allergan.

114. The defective condition of one or both of the aforesaid saline filled breast implants directly caused or contributed to cause Ms. DeGuzman to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff **SHARON DeGUZMAN** demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VIII – ALLERGAN'S PRODUCT NEGLIGENCE

115. Ms. DeGuzman re-alleges and incorporates by reference paragraphs 1 through 71.

116. Allergan was and is the entity that designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants: right and left Natrelle Style 68 High Profile 400 cc saline filled breast implants with serial numbers 16080731 and 15169987, respectively, that were implanted into Ms. DeGuzman on October 15, 2010, and explanted from Ms. DeGuzman on April 11, 2012 or May 11, 2012; right and left Natrelle Style 68 High Profile 400 cc saline filled breast implants with serial numbers 17272629 and 17272633, respectively, that were implanted into Ms. DeGuzman on April 11, 2012 or May 11, 2012, and

explanted from Ms. DeGuzman on February 10, 2017. Accordingly, at all times material Allergan owed one of more of the following duties to the patients who received the implants in surgeries:

(a).    to properly design, assemble, and manufacture the aforesaid Natrelle saline filled breast implants so that none of them created an unreasonable risk of harm, bodily injury, or death to their users or consumers;

(b).    to provide labels and packaging materials that adequately warned implanting surgeons and the using public of the risks and dangers associated with the aforesaid Allergan Natrelle saline filled breast implants, including but not limited to the risk of their valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents, as well as the risk of the valves allowing saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and/or

(c).    to conduct adequate testing on the aforesaid Natrelle saline filled implants before releasing them into the stream of commerce to ensure that they were reasonably safe for their intended use.

117.    On or before August 2010 Allergan knew or should have known that the aforesaid Natrelle saline filled breast implants posed an unreasonable risk of harm, bodily injury, or death to its users, the patients who had them implanted into them.

118.    Allergan breached the duties it owed to its users, the patients who had Natrelle saline filled breast implants implanted into them, in one or more of the following ways:

a.     Design

(1).    One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and

(3).    Prior to the time that the implants identified above were sold, distributed and/or placed into the stream of commerce, a safer alternative design for the aforesaid saline filled breast implants existed and was commercially feasible; and

(4).    The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.     Manufacture

One or both of the aforesaid saline filled breast implants was defectively manufactured such that

(1).    One or more of the aforesaid saline filled breast implants was manufactured such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was manufactured such that the valves allowed saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

c.    <u>Warning</u>

(1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of their valves permitting liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained inadequate warning of the risks of their valves allowing saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

119.    Allergan's breach of the duty or duties it owed to users of Natrelle saline filled breast implants, including Ms. DeGuzman, directly caused or contributed to cause Ms. DeGuzman to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff **SHARON DeGUZMAN** demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

# CERTIFICATE OF REASONABLE INVESTIGATION

The undersigned counsel hereby certifies that he has made a reasonable investigation as permitted by the circumstances which have given rise to a good faith belief that grounds exist for the bringing of this action.

/s/ Christopher Shakib

**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida 32202
Telephone:     (904) 632-2424
Facsimile:      (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: aashley@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiff

/s/ Leslie A. Goller

**Leslie A. Goller, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida 32202
Telephone:     (904) 632-2424
Facsimile:      (904) 632-5049
Primary Email: lgoller@terrellhogan.com
Secondary Email: lkipp@terrellhogan.com
Florida Bar No.: 0393932
Attorney for the Plaintiff